1

2

3                                                    **E-FILED on**  8/29/06

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                                SAN JOSE DIVISION

11

12   MAREY DRAKE,                              | Civil No. C-04-03073 RMW

13              Plaintiff,                     | ORDER REMANDING CASE

14        v.

15   JO ANNE BARNHART,
     Commissioner of Social Security,

16

17              Defendant.

18
        Plaintiff Marey Drake ("Drake") brings this action under 42 U.S.C. § 405(g) to obtain review
19
     of the Commissioner's decision denying her claim for Social Security disability insurance benefits.
20
     On April 3, 1997, Drake filed an application for Disability Insurance Benefits alleging an inability to
21
     work due to pains in the neck, shoulders, arms and hands.  Administrative Transcript ("TR") 18.
22
     Drake's alleged onset date was September 27, 1996.  *Id*.  The application was denied initially and
23
     upon reconsideration.  *Id*.  An Administrative Law Judge ("ALJ") held a hearing on November 3,
24
     1998.  *Id*.  He concluded that Drake "lack[ed] the residual functional capacity to lift and carry more
25
     than fifteen pounds or more than ten pounds on a regular basis or stand or walk for a prolonged
26
     period," and that she "should be allowed to change posture at will and should not be required to
27
     swivel her neck more than occasionally."  TR:22.  However, he found that these limitations did not
28
     prevent Drake from performing her past relevant work as a receptionist or administrative assistant

1   and thus denied her application.  TR:22-23.

2        Drake filed an appeal with the United States District Court for the Eastern District of

3   Washington, which vacated the ALJ's decision and remanded the case for a new hearing.  Since she

4   had resumed employment, Drake then amended her application alleging a closed period of disability

5   from September 27, 1996 to January 1, 2001.  TR:304.  An Administrative Law Judge ("ALJ 2")

6   held a new hearing on March 18, 2004 in San Jose, California.  On April 25, 2004 ALJ 2 denied

7   benefits, finding that Drake was capable of performing her past relevant work as an administrative

8   assistant and as a secretary or making a vocational adjustment to other work existing in significant

9   numbers in the national economy.  TR:286-87.  Drake appealed to this court on July 28, 2004.

10       Drake moved for summary judgment, arguing that the court should award her benefits or, at

11  least, remand the case.  The Commissioner's opposition agreed that a remand was appropriate but

12  objected to awarding Drake benefits.  For the reasons set forth below, the court remands Drake's

13  case.

14                              **I. BACKGROUND**

15       Drake was born on June 8, 1942.  She has a high school education and has worked as a

16  dressmaker, receptionist, secretary, administrative assistant and accounting clerk.  TR:19.  She

17  testified that she was working as a temporary employee at the Stanford Linear Accelerator in 1996

18  when she began to experience numbness and tingling in her right arm and fingers.  TR:362.  She

19  could relieve these symptoms by shaking her arm.  TR:363.  However, she could only work for

20  about five or ten minutes before she would have to stop and do so.  *Id*.  Using a computer was

21  particularly difficult.  *Id*.  Although she is right handed, she eventually had to teach herself to

22  operate a mouse with her left hand.  TR:363-64.  She stated that she was not able to handle small

23  objects, such as jewelry clasps.  TR:364.  The pain became so bad that she quit her job.  TR:362-63.

24       According to Drake, she could not work for a number of reasons.  She could not sit or stand

25  for extended periods.  TR:370.  She was generally able to sit for only about half an hour at a time.

26  TR:370-71.  She was only able to do light house work in 15-minute increments because of pain.

27  TR: 371.  She could not work full weeks because it was too much sitting in one position and there

28  was not enough freedom of movement.  TR:372.  She had lumbar pain.  TR:364-65.  On a bad day,

1  which happened three or four times a month, her activities included taking medication, doing

2  stretching exercises, lying on a heating pad in half hour or one hour segments and getting up to do

3  something in between.  TR:366-67.  She took painkillers, an antidepressant, and a muscle relaxant.

4  TR:372.  She also experienced emotional problems as a result of trying to support her husband

5  whose oldest son committed suicide.  TR:368.

6          Elsie Tupper, M.D., was Drake's treating physician during the period from the end of 1996 to

7  early 1998.[1]  On August 5, 1997, Drake saw Dr. Tupper about her back and hand problems.  TR:231.

8  Dr. Tupper described Drake's complaints:

> 9          Patient complains that she has numbness of her third, fourth and fifth fingers of her
> right hand, alteration of sensation of her right arm when operating a mouse on her
> 10        computer.  She is right handed, causing this to be a real problem in her work.  She
> has pain in both wrists with stiffness and loss of strength.  Her cervical spine has
> 11        limitation of motion with pain.  Her lumbar spine has sharp stabbing pains.  Her
> legs and feet are free from pain except for when she has to sit in a straight chair or
> 12        when driving.  She has sacralization of her right lumar spine.  This patient's
> occupation is secretarial, requiring constant use of a computer, which is difficult
> 13        for her to do at this time . . . .  Herbems nodes on fingers more marked on right fore
> finger on DIP joint, unable to straighten joint, pain in hands on operating a mouse
> 14        and typing, right arm becomes numb while working a mouse, moderate pain in
> shoulders and neck posteriorly"; and "altered sensation of righ[t] arm while
> 15        operating a mouse and right 3rd, 4th, 5th fingers.

16  *Id*.

17          On June 7, 1997 Daniel Phan, M.D., evaluated Drake regarding arthritis in the cervical spine

18  and numbness in the right hand.  TR:217.  Drake told him that she once had lower back pain but was

19  able to be pain-free for seven years after undergoing massage therapy.  *Id*.  Dr. Phan noted that an x-

20  ray taken by Drake's orthopedic physician revealed arthritis in C4-C5, C5-C6, and C6-C7.  *Id*.  Dr.

21  Phan reported that Drake's fingers, especially her right fifth finger, exhibited prominent digital

22  interphalangeal joints.  TR:219.  He also found that her right hand tested positive for Phalen's.[2]  *Id*.

23  He determined that she was limited in her cervical flexion to 45 degrees, extension to 35 degrees,

---

24

25      [1]      Drake submitted various records related to visits to Dr. Tupper, including office visit
records, doctor's prescriptions, prescription receipts and lab results.  Some of the office visit records
26  do not have legible dates and the court cannot locate records for some of her office visits which are
evidenced by other records such as doctor's prescriptions.

27      [2]      The term "Phalen's" refers to a diagnostic test to check whether the nerves in the wrist
are working well.  In the Phalen's maneuver, "the wrist is flexed for 30 to 60 seconds. If you develop
28  pain, numbness or tingling during these tests, the median nerve in the carpal tunnel may be
compressed."

1  lateral flexion to 30 to 35 degrees, and rotation to 70 degrees to the left and 50 degrees to the right.

2  *Id*.  He found that her motor strength was 5+/5 in both upper and lower extremities, including hand

3  grip on both sides.  *Id*.  He acknowledged that she had neck and hand problems but was puzzled that

4  there had been no definite diagnosis or treatment and speculated that it might be due to "minimal

5  signs and symptoms." TR:220.  He ordered further x-rays to determine if there was any deformity or

6  abnormality.[3]  *Id*.  He stated that she should avoid work that required frequent twisting or turning of

7  her neck and that "she would have difficulty with frequent or repetitive grasping or gross or fine

8  manipulation using the right hand."  *Id*.

9       On January 23, 1998 a doctor examined Drake on behalf of the SSA.[4]  TR:95-101.  The

10  doctor concluded that Drake suffered from "cervical spine DJD" and "r[ight] hand arthritis."  TR:94.

11  He limited her to lifting no more than 20 pounds occasionally, 10 pounds frequently, noted that she

12  could not push or pull normally, and had limited handling (gross manipulation) and fingering (fine

13  manipulation) in her right hand.  TR:95-97.  The doctor also concluded that Drake should "avoid

14  operating heavy and dangerous machinery and commercial driving."  TR:98.

15       On April 29, 1999 Dr. Lawrence Lyon performed a psychological assessment on Drake.

16  TR:263-73.  He stated that Drake appeared to be a fairly reliable historian and that she was alert and

17  oriented to time, place and person.  He found that she presented information in a dramatic manner.

18  "It was difficult to obtain a clear picture of her ongoing medical problems because she tended to run

19  on, change the point, and focus on sometimes irrelevant details."  TR:264.  He conducted both the

20  Wechser Adult Intelligence Scale-III (WAIS-III) test and the Wechsler Memory Scale-III (WMS-

21  III) test, which placed her performance at the 50th percentile and 75th percentile, respectively.

22  TR:266.  He concluded that her MMPI-2 results showed that she was experiencing some

23  psychological problems and that she would likely to be depressed, as well as overcontrolled, tense

24  and agitated.  TR:266-69.  He diagnosed Drake with recurrent, mild major depressive disorder.

25

26  [3]       The court cannot locate evidence that the x-ray was taken under Dr. Phan's order.
    Nor is the court clear whether an x-ray was taken and whether there was any doctor's reports
27  regarding the x-ray.

28  [4]       This doctor is not identified in the record with the exception of his or her illegible
    signature.

1   TR:269.  He suggested that Drake was not likely to consciously exaggerate or feign her physical

2   symptoms but that might be the result of unresolved psychological issues.  *Id*.  He opined that Drake

3   would be able to function satisfactorily in all areas except that her abilities to deal with work

4   stressors and behave in a emotionally stable manner were seriously limited.  *Id*.

5                                    **II. ANALYSIS**

6        **A.      Legal Standard**

7             **1.      Standard for Determination of Disability**

8             Under the Regulations of the Social Security Administration, an evaluation of disability

9    involves a five-step sequential evaluation process, by considering all evidence on record.  20 C.F.R.

10   § 404.1520 (a).  At the initial step, the ALJ must determine whether the claimant is engaged in

11   substantial gainful activity; if so, a finding of nondisability will be made and the claim is denied.  20

12   C.F.R. § 404.1520 (a)(4)(i).  Next, the claimant is evaluated as to whether she has a severe

13   impairment or a combination of impairments that meet the duration requirement of being expected to

14   last for a continuous period of at least 12 months or to result in death. 20 C.F.R. § 404.1520

15   (a)(4)(ii), 20 C.F.R. § 404.1509.  At the third step, the claimant is presumed disabled and awarded

16   benefits if her impairment meets or equals an impairment listed on the Listing of Impairments, 20

17   C.F.R. § 404, Subpart P, App. 1.  20 C.F.R. § 404.1520 (a)(4)(iii).  Otherwise in the fourth step, the

18   ALJ must determine whether the claimant has sufficient residual functional capacity despite the

19   impairment, to perform her past relevant work.  If so, a finding of nondisability will be made and the

20   claim is denied.  20 C.F.R. § 404.1520 (a)(4)(iv).  If the claimant has met her burden of showing that

21   she is unable to perform her past relevant work, the ALJ must decide, based on the claimant's

22   residual functional capacity and age, education and work experience, whether she can make an

23   adjustment to other work that exists in significant numbers in the national economy.  20 C.F.R. §

24   404.1520 (a)(4)(v); 20 CFR § 404.1560 (c)(2).

25             Social Security Rulings 82-62 sets forth a detailed guideline for making a determination at

26   the fourth step:

27             In finding that an individual has the capacity to perform a past relevant job, the
             determination or decision must contain among the findings the following specific
28             finds of fact:

1       1.  A finding of fact as to the individual's RFC.

2       2.  A finding of fact as to the physical and mental demands of the past job/occupation.

3       3.  A finding of fact that the individual's RFC would permit a return to his or her past job or occupation.

4  SSR 82-62.

5       In making these fact findings, "the ALJ, who holds a hearing in the Commissioner's stead, is

6  responsible to determining credibility and resolving conflicts in medical testimony." *Connett v.*

7  *Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003).  When rejecting a claimant's testimony, the ALJ must

8  justify his decision with specific findings." *Id*. (citing *Dodrill v. Shalala*, 12 F.3d 915, 917 (9th Cir.

9  1993)).  Specifically, when the claimant produces medical evidence of an underlying impairment

10  which may reasonably cause the alleged pain, the ALJ "may not discredit the claimant's allegations

11  of the severity of pain solely on the ground that the allegations are unsupported by objective medical

12  evidence." *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991) (en banc).  An adjudicator may,

13  however, discredit claimant's allegations of severity based on specific findings that the allegations

14  are not credible. *Id.* at 345.  "These findings, properly supported by the record, must be sufficiently

15  specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on

16  permissible grounds and did not 'arbitrarily discredit a claimant's testimony regarding pain.'" *Id.* at

17  345-46.

18       When determining the credibility of a claimant's allegations of disabling pain, an adjudicator

19  must consider the following factors:

20       1.  The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

21       2.  Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

22       3.  Type, dosage, effectiveness, and adverse side-effects of any pain medication;

        4.  Treatment, other than medication, for relief of pain;

23       5.  Functional restrictions; and

        6.  The claimant's daily activities.

24

*Id.* at 346 (citing SSR 88–13).

25       The *Bunnell* court provided several examples of specific findings that may support a finding

26  that a claimant's allegations are not credible:

27

28       For instance, if the claimant engages in numerous daily activities involving skills that could be transferred to the workplace, an adjudicator may discredit the claimant's allegations upon making specific findings relating to the claimant's daily activities.

1

2          Another relevant factor may be unexplained, or inadequately explained, failure to
           seek treatment or follow a prescribed course of treatment.  An adjudicator may also
3          use ordinary techniques of credibility evaluation to test a claimant's credibility.  So
           long as the adjudicator makes specific findings that are supported by the record, the
4          adjudicator may discredit the claimant's allegations based on inconsistencies in the
           testimony or on relevant character evidence.

5      *Id*. at 346-47 (internal citations and quotation marks omitted).

6          **B.    ALJ 2's Findings**

7          ALJ 2 found that Drake had not engaged in substantial gainful activity during the relevant

8   period.  TR:286.  ALJ 2 determined that Drake had the following severe conditions based on the

9   requirements of 20 C.F.R. § 404.1520 (c): "moderate degenerative disc disease and degenerative

10  joint disease of the cervical, spine, moderate cervical spondylosis, sever degenerative joint disease

11  of the distal interphalangeal ('DIP') joint of the right 5th finger, and mild right first

12  metatarsophalangeal degenerative joint disease with bunion formation."  TR:286.  However, ALJ 2

13  concluded that none of Drake's conditions met or equaled a listed impairment.  *Id*.

14         ALJ 2 determined that Drake's complaints were "not entirely credible."  TR:283.  ALJ 2

15  reasoned that "the absence of longitudinal records showing regular contact with physicians or

16  referrals to specialists" belied Drake's claimed maladies.  *Id*.  In addition, ALJ 2 noted that Drake's

17  daily activities—which included performing household tasks and other hobbies—were "wholly

18  inconsistent with the degree of limitation alleged."  *Id*.  ALJ 2 also explained that Drake's return to

19  work in January 2001 suggested that she could have sought medical care earlier.  TR:284.  Further,

20  ALJ 2 commented that Drake engaged in a "distinct pattern of exaggeration" with respect to her

21  symptoms, as evidenced by Dr. Lyons' statement that she exhibited "little actual pain behavior."  *Id*.

22  Finally, ALJ 2 discounted Dr. Lyons' and Dr. Phan's opinions to the extent they relied on Drake's

23  descriptions of her limitations.  TR:284-85.

24         ALJ 2 concluded that Drake retains the residual functional capacity to perform heavy work

25  with a preclusion from frequent twisting or turning of her neck and from frequent use of her right

26  hand for gross or fine manipulation.  TR:286.  At the hearing, ALJ 2 asked a vocational expert

27  whether someone with Drake's physical limitations would be able to perform her past relevant work.

28  TR:375.  The vocational expert answered "[n]o, they would not."  *Id*.  In addition, the vocational

    expert testified that such a person would not be able to transfer any skills to jobs that are within the

1   person's residual functional capacity.  *Id*.  ALJ 2 did not address the vocational expert's testimony.

2   Instead, ALJ 2 found that Drake's past relevant work as an administrative assistant and as a secretary

3   did not require her to perform activities from which Drake was precluded.  TR:285.  ALJ 2 also

4   determined that even if Drake could not return to her past relevant work, she would be capable of

5   making adjustments to other work which exists in substantial numbers in the national economy.  *Id*.

6   ALJ 2 applied Rule 204.00 of "the grids"—certain *per se* rules of disability codified in 20 C.F.R.

7   Part 404, Subpart P, Appendix 2—as a framework for this decision.  TR:286.  Accordingly, ALJ 2

8   held that Drake was not disabled.

9   **C.      Whether ALJ Rogers' Conceded Errors Mandate a Remand**

10      "The court shall have power to enter, upon the pleadings and transcript of the record, a

11   judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

12   with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  "Remand for further

13   administrative proceedings is appropriate if enhancement of the record would be useful."  *Benecke v.*

14   *Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).  "Conversely, where the record has been developed

15   fully and further administrative proceedings would serve no useful purpose, the district court should

16   remand for an immediate award of benefits."  *Id*.  A case should not be remanded solely to allow the

17   ALJ to make findings of fact "if (1) the ALJ failed to provide legally sufficient reasons for rejecting

18   the evidence; (2) there are no outstanding issues that must be resolved before a determination of

19   disability can be made; and (3) it is clear from the record that the ALJ would be required to find the

20   claimant disabled were such evidence credited."  *Id*.  In such a case, the district court should credit

21   evidence that was rejected during the administrative process and remand for an immediate award of

22   benefits.  *Id*.  However, a district court has flexibility to amend "solely to allow an ALJ to make

23   specific credibility findings."  *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003).

24      Here, the court reluctantly remands the case despite the delay that will result.  At the hearing,

25   the vocational expert testified that someone with Drake's alleged disabilities would neither be able to

26   return to their previous work nor transfer any skills to new work:

27      Q.   [A]re you able to characterize the nature of the claimant's past relevant work?
        A.   Yes, Your Honor . . . it appears that her actual jobs would have fallen into a
28           light category[.]
        Q.   Okay . . . .  Any what type of hand or arm usage is required in those jobs?

A.   Generally it would range from frequent to continuous.

***

Q.   If we assume a person of the same age, education, and work experience as the claimant . . . [t]hat the person should avoid work that requires frequent twisting or turning of the neck and should avoid activity requiring frequent or repetitive grasping or gross or fine manipulation with the right hand. Would such a person have been able to perform the claimant's past relevant work?

A.   *No, they would not.*

Q.   And would such a person have skills transferable to jobs within that residual function capacity?

A.   *Your Honor, I really believe that any skills that they would have would transfer only to jobs that would not fit within that [residual function capacity].*

TR:373-75 (emphasis added).  Under the grids, the vocational expert's testimony, if credited, would have established that Drake was disabled.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rules 201.06; 202.06 (person of Drake's age, education, and experience who is capable of light or sedentary work with no transferable skills is "disabled").

ALJ 2 apparently did not accept the vocational expert's testimony because she found that Drake was "able to perform a full range of heavy, a full range of medium, [and] a full range of light work." TR:286.  "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds." 20 C.F.R. § 404.1567.  However, ALJ 2 did not explain how she reached this determination.  Moreover, no evidence in the record supports the proposition that Drake could perform such tasks.  *Compare* TR:95-97 (opinion of SSA doctor that Drake could lift no more than 20 pounds occasionally and 10 pounds frequently); TR:220 (opinion of Dr. Phan that Drake "would have difficulty with frequent or repetitive grasping or gross or fine manipulation using the right hand").

ALJ 2 did indicate that she doubted Drake's credibility.  "Reason[s] for rejecting the claimant's testimony must be 'clear and convincing,' and supported by specific findings." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (internal citation omitted).  The court respectfully submits that ALJ 2's decision does not meet this standard.  For example, ALJ 2 reasoned that Drake could have alleviated her alleged disability by more aggressively seeking medical care:

When she was asked what changed in January of 2001 that enabled her to return to work, the claimant's response is particularly revealing. The claimant stated [that] she received conservative treatments such as physical therapy, chiropractic care, hot wax treatments, or anti-inflammatory medications; or made simple adjustments such as learning to use the mouse with her left hand . . . . All of these conservative treatments or modalities were available to the claimant during the period [for which] she alleges disability but the claimant did not avail herself of them. She has used

1

2

many [of] these conservative treatments in the past, some, like chiropractic care, for years.

3

TR:284. However, the record does not reveal that Drake stopped trying to ameliorate her condition

4

during her alleged period of disability.  Drake saw Dr. Phan and Dr. Tupper approximately six times

5

between June 1997 and January 1998 about her neck, back, and hand pain.  On August 5, 1997 Dr.

6

Tupper noted that Drake was taking pain medication and that it "ha[d] not given adequate relief."

7

TR:231.  On October 2, 1997 Dr. Tupper indicated that Drake was engaging in stretching exercises

8

and taking muscle relaxants.  TR:226.  In addition, Drake testified that her condition improved in

9

2001 when a neurosurgeon in California referred her to a hand therapist.  TR:369.  From Drake's

10

testimony, it appears that she was not aware of the possibility of minimizing her pain through the

11

"conservative" measures until she met with the hand therapist.  *See id.* ("[t]he hand therapist *taught*

12

*me* some ways that I could alleviate the major portion of the pain by doing exercises, hot wax

13

treatments every day, and taking pain medications, anti-inflammatory medication, because it's

14

inflamed the joints") (emphasis added).

15

ALJ 2 also determined that Drake "has repeatedly acknowledged that she regularly performs

16

significant daily activities inconsistent with the degree of limitation alleged," including "crocheting,

17

doing laundry, sitting, reading a book, working on the computer, sewing, feeding her animals, and

18

watering the plants."  TR:283.  It is not clear, however, that these activities are necessarily

19

inconsistent with her claimed limitations.  In addition, Drake explained that she needed to rest every

20

15 minutes when performing these tasks.  TR:196.

21

Finally, ALJ 2 relied on Dr. Lyon's statement that Drake "demonstrated little actual pain

22

behavior during the 3 1/2 hour interview."  TR:282.  However, Dr. Lyon—who is a psychologist, not

23

a medical doctor—did not examine Drake to determine the cause or severity of her physical

24

ailments.  His opinion about Drake's pain applies with less force.  *Compare Dahho v. Massanari*,

25

2001 WL 1006817 *6 (N.D. Cal. 2001) (rejecting psychologist's opinion about claimant's physical

26

symptoms because he "is a psychologist and not a medical doctor").  Accordingly, ALJ Rogers did

27

not articulate "clear and convincing reasons" to discount Drake's credibility.

28

Although the court is reluctant to again remand this case, the Commissioner concedes that

remand is appropriate.  The court is also reluctant to order benefits awarded at this time because

1    further enhancement of the record would be useful.  Upon remand the ALJ should hold a new

2    hearing and determine Drake's residual functional capacity based upon the medical evidence of

3    record, both physical and mental, and enhance the record if necessary.  The ALJ should more fully

4    explore whether there is work that existed in significant numbers in the national economy that Drake

5    could have performed.  The ALJ should pose hypothetical questions to a vocational expert that

6    accurately reflect Drake's residual functional capacity.

7                                          **III. ORDER**

8            The court remands the case to the Commissioner with the instruction to hold a new hearing

9    as outlined above.

10

11   DATED: _____8/28/06_____        _____
                                                   RONALD M. WHYTE
12                                                 United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **Notice of this document has been electronically sent to:**

2   **Counsel for Defendant:**
    Sara Winslow                    sara.winslow@usdoj.gov

3   **Counsel for Drake:**
4   Terry LaPorte                   tlaporte@ix.netcom.com

5

    **Dated:**_____8/29/06_____          _____SPT_____
6                                            **Chambers of Judge Whyte**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28